UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF VIRGINIA
Norfolk Division

| | | |
|---|---|---|
| UNITED STATES OF AMERICA, | ) | CRIMINAL NO. 2:17cr 43 |
| | ) | |
| v. | ) | 18 U.S.C. § 371 |
| | ) | Conspiracy to Receive Gratuities |
| WILLIAM R. HUTSENPILLER, | ) | by a Public Official |
| | ) | Count One |
| Defendant. | ) | |
| | ) | 18 U.S.C. § 981(a)(1)(C) |
| | ) | Forfeiture Allegation |

CRIMINAL INFORMATION

The United States Attorney charges that:

**Introductory Allegations**

1. Sub-contracting Firm G (Firm G), a Missouri corporation located in Fayetteville, NC, provides professional technical support services under subcontract to numerous Department of Defense (DoD) entities.

2. PAM began employment at Firm G in 2002 and subsequently became the president and CEO. He became sole owner in 2007.

3. In 2006, KJD became the Corporate Controller of Firm G.

4. Contracting Firm T (Firm T), located in Wichita, Kansas, a female-owned small business and small disadvantaged business, is a professional service firm that provides technical, scientific, management and logistics support services to industry and government agencies.

5. WILLIAM R. HUTSENPILLER was the civilian GS-15 Financial Department Head/Comptroller for Norfolk Ship Support Activity (NSSA) from approximately October 2009 through November 2013, when he was reassigned to Fleet Forces Command where he remained

1

until his retirement in 2015. In his role as the NSSA Comptroller, HUTSENPILLER oversaw NSSA's $200 million operating budget, which included payroll, facilities, overtime, travel and leave. The Comptroller's job is to establish, defend and execute the budget. Money to pay for NSSA contracts flows through the Comptroller's office. While employed in these positions, HUTSENPILLER was assigned in Portsmouth, VA, and Norfolk, VA, each within the Eastern District of Virginia.

## COUNT ONE

From in or around March 2010, and continuing until in or around September 2014, in the Eastern District of Virginia and elsewhere, defendants PAM, KJD and HUTSENPILLER knowingly and willfully conspired and agreed together with each other, and with other persons both known and unknown to the United States Attorney, to commit the following offense against the United States, that is:

> For a public official, as defined in 18 U.S.C. § 201(a)(1), otherwise than as provided by law for the proper discharge of official duties, directly or indirectly demanded, sought, received, accepted, or agreed tp receive or accept a thing of value personally, or sought, accepted or agreed to accept the thing of value for or because of an official act performed or to be performed, in violation of Title 18, United States Code, § 201(c)(1)(B).

## WAYS MANNER AND MEANS OF THE CONSPIRACY

The ways, manner and means by which the conspiracy was carried out included, but were not limited to the following:

1. From in or around March 2010, and continuing until in or around September 2014, in the Eastern District of Virginia and elsewhere, defendants PAM, KJD and HUTSENPILLER and

2

other persons known and unknown to the United States Attorney knowingly and willfully conspired and agreed together with each other for HUTSENPILLER to receive gratuities from Firm G.

2. PAM and HUTSENPILLER first met in approximately 2008 while Firm G was working as a subcontractor on a prime contract performing work at NSSA. At the expiration of the prime contract, NSSA awarded a new contract to Firm T in 2010. Beginning in March 2010 and continuing until May 2010, HUTSENPILLER, PAM, KJD and others known and unknown to the United States Attorney discussed methods that could be utilized to coerce Firm T to accept Firm G as a subcontractor. These individuals held meetings in Virginia and North Carolina and conducted other private discussions, which culminated in the coercion of Firm T to accept Firm G as its main subcontractor and permitted HUTSENPILLER access to Firm G which was a willing participant in various illegal schemes to include holding government funds that should have been returned to the U.S. Government.

3. During the course of the NSSA contract with Firm T, HUTSENPILLER directed Firm T to pass government funds from NSSA, through Firm T and into Firm G. In some instances, HUTSENPILLER or one of his contractors would then direct Firm G to perform or subcontract work to second tier subcontractors, thereby expending most of the funding directed to Firm G by HUTSENPILLER on legitimate work. At times, funding directed to Firm G and not expended on legitimate work would remain at Firm G until further direction was given by HUTSENPILLER for the money to be expended or held.

4. This pattern of activity between HUTSENPILLER and Firm G continued during the course of Firm T's contract, but also occurred while Firm G was performing work as a sub-

contractor on General Service Administration and U.S. Army contracts. As such, at the conclusion of various task orders, technical direction letters or on contracts, the unexpended funds should have been returned to the U. S. Government or to one of its prime contractors. Nevertheless, HUTSENPILLLER would and did direct Firm G to expend the money held by Firm G on other tasks, to purchase various items that were for his personal use, or permit the funds to remain in Firm G's operating budget where it was under the custody and control of PAM and KJD. Toward the end of 2013, approximately $5.1 million dollars of unexpended Government funds remained under the custody of PAM and KJD at Firm G, with the knowledge and consent of HUTSENPILLER. Approximately $2.4 million of the $5.1 million dollars of unexpended Government funds were specifically directed to Firm G by HUTSENPILLER for the purpose of his retirement.

5. From in or around 2010 through the end of 2013, HUTSENPILLER made several requests that Firm G provide him with various items of value and services for his personal use, which were to be purchased with the government funds held by Firm G. KJD made the purchases and PAM had knowledge of such purchases. The various items of value and services provided to HUTSENPILLER by Firm G included, but were not limited to: Verizon cell phone service for HUTSENPILLER's personal cell phone, Verizon air card service for HUTSENPILLER's personal electronic devices, cell phone accessories, a Samsung cell phone for HUTSENPILLER's wife, multiple iPads, a Dell computer, computer accessories, a Nest Learning Thermostat, Apple TV, Roku Box 3, Sound Link Air Digital Music System and Sound Link rechargeable lithium battery. The approximate value of these items and services received by HUTSENPILLER from Firm G was approximately $35,870.69.

6. Beginning in 2010 and continuing until in or around September 2014, HUTSENPILLER and PAM had ongoing discussions regarding HUTSENPILLER obtaining employment at Firm G upon his civil service retirement. Throughout this time period, HUTSENPILLER and PAM held multiple discussions regarding the amount of money HUTSENPILLER would need to earn in order to maintain the same income level he had as a GS-15 civil servant. In April 2014, HUTSENPILLER and PAM met at Roanoke Rapids, North Carolina, for the specific purpose of discussing the details of HUTSENPILLER's post-civil service employment at Firm G. During that meeting, HUTSENPILLER informed PAM that he would require a yearly salary of $150,000. This pending salary was to be paid out of the approximately $2.4 million of excess government funds that HUTSENPILLER had previously directed to Firm G. PAM agreed to hire HUTSENPILLER upon his retirement from the civil service. HUTSENPILLER never went to work for Firm G and never received any money from Firm G.

7. As a result of a Naval Audit Service inquiry into HUTSENPILLER's processes and procedures used to procure support services, which found that HUTSENPILLER charged unallowable fees to Naval Commands which totaled millions of dollars, HUTSENPILLER was removed from his Comptroller position at NSSA in November 2013. PAM and KJD thereafter created two fictitious invoices using a limited liability corporation owned by PAM: $1,577,870 on December 2, 2013 and $3,155,742 on January 2, 2014. A General and Administrative Expense of 9.4%, or approximately $445,000, was added to the two limited liability corporation invoices to Firm G to make them appear legitimate. The resulting balance of the excess government funds, in the amount of $4,733,612, that was under the custody and control of PAM and KJD at Firm G, was subsequently moved to the limited liability corporation owned by PAM

and his spouse, and eventually deposited into investment accounts owned by PAM and his spouse at Morgan Stanley. Ultimately, HUTSENPILLER did not go to work for Firm G and did not receive any financial payment from PAM. HUTSENPILLER had no knowledge of the invoices that PAM created to move the money and no role in moving any funds at Firm G to Morgan Stanley.

8. From in or around 2010, and continuing until approximately September 2014, HUTSENPILLER, PAM, and KJD knowingly and willfully conspired and agreed together with each other, resulting in HUTSENPILLER obtaining approximately $35,870.69 in gratuities from Firm G with PAM's knowledge and consent, and a further promise from PAM for employment at Firm G following HUTSENPILLER's civil service retirement.

## OVERT ACTS

In furtherance of the conspiracy and to affect the objects of the conspiracy, the following overt acts, among others were committed in the Eastern District of Virginia and elsewhere:

1. From on or about January 21, 2011, through on or about July 20, 2012, HUTSENPILLER's personal cell phone service was registered under Firm G's Verizon business account. HUTSENPILLER's personal cell phone bill was paid for by Firm G in the amount of $2,229.64 during this timeframe.

2. From on or about January 22, 2011, through on or about July 21, 2014, service for two air cards utilized by HUTSENPILLER in his personal electronic devices were registered under Firm G's Verizon business account. HUTSENPILLER's air card usage bill was paid for by Firm G in the amount of $2,417.22.

3. On September 9, 2014, during a law enforcement operation conducted at HUTSENPILLER's residence, numerous electronics and electronic devices were seized. These items include, but are not limited to: an iPad mini, iPad Air, laptop computer, Apple TV, Sound

Link Air Digital Music System and a Roku Box 3. The approximately $6,787.74 cost of these items were paid for by Firm G and subsequently provided to HUTSENPILLER.

4. In or about January 2010, HUTSENPILLER received a Bose Quiet Comfort 15, Communications Kit, 20'extension Cable Bose headphone and multiple batteries. These items were ordered and the approximately $516 cost of the items were paid for by Firm G.

5. In or about November 2011, HUTSENPILLER received a Dell Latitude Laptop computer, Dell Adventure 14" sleeve, Dell Bluetooth 5-Button Mouse, Apple In-Ear headphones, iPad 2, iPad Smart Cover, Apple iPad Camera connection kit and various other electronics related items. These items were ordered and the approximately $4,130 cost of the items were paid for by Firm G.

6. In or about April 2012, HUTSENPILLER received an iPad 3, iPad Smart Cover, Apple iPad Dock, iPad USB Power Adapter and an Incase Dual Car Charger. These items were ordered and the approximately $3,549 cost of the items were paid for by Firm G.

7. On or about April 27, 2014, HUTSENPILLER met with PAM in Roanoke Rapids, North Carolina. During that meeting, HUTSENPILLER informed PAM that he would need to receive a yearly salary of $150,000 from Firm G once he left the civil service.

8. On or about April 27, 2014, in Roanoke Rapids, North Carolina, PAM agreed to hire HUTSENPILLER at Firm G after HUTSENPILLER retired from the civil service.

## FORFEITURE ALLEGATIONS

1. The defendant, if convicted on the violation alleged in the Criminal Information, shall forfeit to the United States, as part of the sentencing pursuant to the Federal Rule of Criminal Procedure 32.2, any property, real or personal, which constitutes or is derived from proceeds traceable to the violation.

2. If any property that is subject to forfeiture above, as a result of any act or omission of the defendant, (a) cannot be located upon the exercise of due diligence, (b) has been transferred to, sold to, or deposited with a third party, (c) has been placed beyond the jurisdiction of the Court, (d) has been substantially diminished in value, or (e) has been commingled with other property that cannot be divided without difficulty, it is the intention of the United States to seek forfeiture of any other property of the defendant, as subject to forfeiture under Title 21, United States Code, Section 853(p).

(In accordance with Title 18, United States Code, Section 981(a)(1)(C) and Title 28, United States Code, Section 2461(c)).

Respectfully submitted,

Dana J. Boente
United States Attorney

By: *[signature]*
Stephen W. Haynie
Assistant United State Attorney
VBS No. 30721
U.S. Attorney's Office
101 W. Main Street, Ste. 8000
Norfolk, Virginia 23510
Office Number - 757-441-6331
Facsimile Number - 757-441-3205
steve.haynie@usdoj.gov