```
 1                IN THE UNITED STATES DISTRICT COURT
               FOR THE EASTERN DISTRICT OF VIRGINIA
 2                       Norfolk Division

 3

 4   - - - - - - - - - - - - - - - - - -
                                       )
 5     UNITED STATES OF AMERICA,       )
                                       )
 6                                     )   CRIMINAL ACTION NO.
       v.                              )   2:17cr43
 7                                     )
       WILLIAM R. HUTSENPILLER,        )
 8                                     )
                    Defendant,         )
 9   - - - - - - - - - - - - - - - - - -

10

11

12                  TRANSCRIPT OF PROCEEDINGS

13                       Norfolk, Virginia

14                      September 21, 2017

15

16   BEFORE:  THE HONORABLE REBECCA BEACH SMITH
             Chief United States District Judge

17

18

19   APPEARANCES:

20           UNITED STATES ATTORNEY'S OFFICE
             By:  Alan Salsbury
21                Stephen Haynie
                  Assistant United States Attorney
22                Counsel for the United States

23           SHUTTLEWORTH, RULOFF SWAIN HADDAD & MORECOCK PC
             By:  Lawrence H. Woodward, Jr.
24                Counsel for the Defendant

25
```

1          (Hearing commenced at 2:01 p.m.)

2          THE CLERK:  In case 2:17cr43, United States of

3     America versus William R. Hutsenpiller.

4          Mr. Salsbury, Mr. Haynie, is the government ready

5     to proceed?

6          MR. SALSBURY:  We are ready.  Good afternoon, Your

7     Honor.

8          THE COURT:  Good afternoon.

9          THE CLERK:  Mr. Woodward, is the defendant ready to

10    proceed?

11         MR. WOODWARD:  Good afternoon, Your Honor.  We are

12    ready to proceed.

13         THE COURT:  Good afternoon.  Sir, are you William

14    R. Hutsenpiller?

15         THE DEFENDANT:  Yes, ma'am.

16         THE COURT:  Have you reviewed your background

17    presentence report with Mr. Woodward?

18         THE DEFENDANT:  Yes, ma'am.

19         THE COURT:  You may be seated.

20         Counsel, I have reviewed the file, and I'll briefly

21    review it here today before we proceed directly into the

22    sentencing.  This defendant pled guilty to count one of the

23    single count criminal information on April 10, 2017.

24         Count one charges the defendant with being involved

25    in a conspiracy to receive and accept gratuities as a public

1    official, in violation of Title 18 of the United States Code

2    § 371.

3              The United States Magistrate Judge Lawrence R.

4    Leonard accepted the defendant's plea, which was accompanied

5    by a plea agreement and a statement of facts, both of which

6    were filed in open court on April 10, 2017.

7              In the plea agreement the defendant has waived his

8    right to appeal in Paragraph 5.  I have reviewed the plea

9    proceedings and the full file, and I find no reason not to

10   accept the proceedings thus far and to adjudge the defendant

11   guilty of the offense to which he pled.

12             The presentence report was prepared, and everyone

13   has presented their position papers.  There is an

14   outstanding objection.  The defendant and the United States

15   object for different reasons to the enhancement for the role

16   in the offense, and the Court will have to make a finding of

17   fact in that regard.

18             There is also a motion by the United States for a

19   downward departure under § 5K1.1 of the sentencing

20   guidelines, and the Court also received an allocution letter

21   which, obviously, the defendant can read or still make

22   further allocution to the Court, and also four character

23   letters.  So those have all been made a part of the

24   presentence report.  They were with your position paper, and

25   I would direct that they be made part of the presentence

1    report so that they follow the defendant through the system.

2         So that would bring us to the point of resolving

3    the objection of enhancement for role in the offense.  The

4    defendant objects to the assessment of a three level

5    enhancement for a managerial role in the offense, pursuant

6    to United States Sentencing Guideline Section 3B1.1(b), and

7    the United States objects to the same enhancement but argues

8    that the defendant should receive a four level enhancement

9    as a leader of the criminal activity.

10        You can go forward with that and any presentation,

11   Mr. Salsbury.

12        MR. SALSBURY:  Thank you, Your Honor.  Your Honor,

13   Section 3B1.1(a) of the guidelines provides for a four level

14   increase if the defendant was an organizer or a leader of a

15   criminal activity that involved five or more participants or

16   was otherwise extensive.  We are prepared to present

17   evidence, through a witness, showing that the criminal

18   activity in this case did, indeed, involve five or more

19   participants.

20        However, before doing that, our position is that

21   the statement of facts, on its face, shows that the

22   defendant was an organizer and leader of criminal activity

23   that was extensive.  If that is correct, then the

24   enhancement applies on that basis, and there is no need to

25   present evidence regarding the number of participants.

1          So my suggestion would be that the Court first hear

2     argument and rule on whether the statement of facts on its

3     face shows that the defendant was an organizer and leader of

4     criminal activity and that that activity was extensive.  If

5     the Court were to agree with the government's position,

6     there would be no need to present evidence on the number of

7     participants.

8          THE COURT:  I understand what you're saying.  It's

9     in the disjunctive as opposed to the conjunctive in the

10     guidelines, so it's either five or more participants or

11     otherwise extensive.  There are two bases upon which to

12     grant the enhancement under subsection (a).

13          MR. SALSBURY:  Right.  We think the agreed

14     statement of facts on its face shows that the four level

15     enhancement applies.

16          THE COURT:  All right.  Of course, you understand

17     that judges like to have as many grounds as possible upon

18     which to make a ruling, if necessary, for future

19     proceedings.

20          MR. SALSBURY:  Certainly, Your Honor.

21          THE COURT:  You may proceed on both of those bases,

22     but let me hear from Mr. Woodward.

23          MR. WOODWARD:  Well, yes, Your Honor.  I think the

24     issue is slightly different.  I certainly don't dispute

25     Mr. Salsbury's rendition of what the guidelines say and what

1    the bases are.  I think the real issue is whether or not my

2    client was a leader, manager, or organizer, not the extent

3    of the conduct or the number of participants.  As you

4    noticed in my position paper, Your Honor, this case is a

5    little unusual.  There is four people that are involved, and

6    there are three different judges that have or will deal with

7    this case.  Judge Jackson had, I believe, Mr. Bricker, judge

8    Allen had Mr. Deines, and I think Judge Allen has

9    Mr. Mearing.

10          Our position is, is that clearly the four point

11   enhancement would not apply.  Mr. Mearing, if you look at

12   those statements of facts, I think it's in Paragraph 6 of

13   most of them, Bricker, Deines and Mearing were involved in

14   committing government contractor fraud for a decade or more.

15          Mr. Hutsenpiller got involved in 2010 with those

16   folks in something that had been going on since 2004, and he

17   certainly was one of the tentacles of the octopus, he's

18   accepted responsibility for that, and stands here today to

19   be, you know, punished for that.

20          My position is, is that the issue is not whether

21   the conduct was extensive.  I would submit that the overall

22   conduct was extensive.  I mean, I'm not going to argue that

23   point.  I think the Court would probably not give me a lot

24   of credibility if I did.  I mean, Bricker and Deines,

25   Bricker, I think, was found to have committed $12 million of

1    fraud and Deines 7 million.  It may be the opposite of that,

2    and I think Mr. Mearing's statement of facts is up in the

3    $13 million range.

4            So the real issue, from my standpoint, Your Honor,

5    is what was my client's role in the offense, not what the

6    overall offense encompassed.  Our argument would be that he

7    pled guilty to a gratuities offense, 35 or $36,000 worth of

8    gratuities.

9            One of the things that the Court looks at under the

10   application notes is what amount of the proceeds of the

11   criminal activity did someone receive to determine if they

12   are a leader, manager, or organizer.  That would be our

13   position, that he just doesn't qualify, that Mr. Mearing is

14   the leader, manager, and organizer.  Mr. Deines and

15   Mr. Bricker, I realize the Court didn't have those cases.

16   The government did not seek, the probation office did not

17   seek, and they were not given any kind of role in the

18   offense.

19           Now, Mr. Mearing, to be fair, he hasn't been

20   sentenced yet, but when we were discussing this with

21   probation, and they pointed out, and apprised me, even

22   though I don't get those PSRs, that neither of those

23   individuals -- one of whom was the accountant and one of

24   whom, I believe, was the chief financial officer, if that's

25   the right term, Mr. Deines, or the comptroller, I think he

1  was called, of the Global Industries.

2       So I also think that that enhancement should have

3  with it an element of what's fair.  For the government

4  essentially to say that -- I mean, the most enhancement

5  anybody can get under that guideline is four points.  I

6  don't know what Mr. Mearing is going to look like when he

7  gets in front of Judge Allen, but the government's position

8  is that my client is equal to Mr. Mearing in terms of that

9  enhancement.  I understand there can be more than one person

10 that can have a leader or manager or organizer role.

11      THE COURT:  Go through each one.  So Mr. Bricker.

12      MR. WOODWARD:  Yes, Your Honor.

13      THE COURT:  I'm familiar with his sentencing, but

14 just for our record, what was his role, from your opinion?

15      MR. WOODWARD:  Mr. Bricker was the accountant and

16 the owner of company A and company B.  I don't know what

17 they are, but to me Mr. Bricker was the person that,

18 beginning in 2004 and continuing to 2014, funneled the money

19 through his company for Global.  I'm trying to be true to

20 the statement of facts.  I don't get, you know, all of the

21 discovery that relates to Mr. Bricker, but that's what I

22 understand his role to be based on the statement of facts,

23 that he did not work for Global.  He was an accountant that

24 worked with Global and some of the contractors.

25      THE COURT:  All right.  He was the accountant for

1  companies A and B?

2  MR. WOODWARD:  Yes, ma'am.  Was an accountant and

3  was also an owner of company A and B.

4  THE COURT:  All right.

5  MR. WOODWARD:  Which I don't know what company A

6  and B are, other than they were companies that, as I

7  understand from the statement of facts, were used to

8  perpetuate or perpetrate the fraud beginning in 2004.

9  THE COURT:  All right.  So that's Mr. Bricker.

10  MR. WOODWARD:  Yes, Your Honor.

11  THE COURT:  All right.  How about Mr. Deines?

12  MR. WOODWARD:  Mr. Deines was the corporate

13  comptroller of firm G, which we now know that firm G is

14  Global Enterprises.  He was the person, as I understand it,

15  that handled and directed all the money.  He worked for

16  Mr. Mearing.  Mr. Mearing was the owner.  So he was not an

17  owner of the company, but he was the comptroller who

18  directed and managed these contracts and accounts on which

19  the fraud occurred, the various government contracts.

20  THE COURT:  All right.  Mr. Mearing?

21  MR. WOODWARD:  Mr. Mearing, Your Honor, was the

22  owner of Global Enterprises.  He has pled but not yet been

23  sentenced.  He became the sole owner in 2007, according to

24  his agreed statement of facts.  Even before he became the

25  owner, just says he began employment in Global at 2002, was

```
 1   the president, chief executive officer, and then owner by
 2   2007.  He set up the fraud, for lack of a better word, on a
 3   number of different contracts.
 4           THE COURT:  Can you wait just a minute, please?
 5           MR. WOODWARD:  Yes, ma'am.  So if the Court looks
 6   at those statements of facts, the stuff that my client pled
 7   guilty to that's contained in my client's statement of facts
 8   is one part of this overall scheme that began.
 9           My client, what the criminal conduct that he got
10   involved in began in 2010 and went till late '13 or '14, I
11   believe.  But Deines, Bricker and Mearing all pled guilty
12   and agreed that they had been engaged in government
13   contractor fraud in things that both involved and did not
14   involve Mr. Hutsenpiller beginning in 2004 and continuing
15   until 2014.
16           THE COURT:  Well, let's just focus on this
17   defendant, his involvement in 2010.  We are not talking
18   about prior to any alleged involvement.  We are talking
19   about the statement of facts.
20           You would agree with that, Mr. Salsbury, we are
21   focusing on the period 2010 to 2014?
22           MR. SALSBURY:  Well, I would, Your Honor.  In fact,
23   Mearing pled to an entirely separate fraud.
24           THE COURT:  I know, but I'm talking about for this
25   defendant.
```

1          MR. SALSBURY:  That's correct.

2          THE COURT:  I'm going to let you respond to what he

3     is saying, but for this defendant, I want to make it clear

4     so that someone doesn't go back and say we focused on the

5     wrong time period.  The time period that we are looking at

6     for this defendant's actions for this enhancement and for

7     sentencing are the time period when he was involved with

8     this conspiracy or these activities, which would be starting

9     in or around 2010 until in or around September of 2014.

10    That's what the statement of facts indicates.  Everybody's

11    agreed that's the time period we are looking at for this

12    defendant?

13         MR. WOODWARD:  The defense agrees, Your Honor.

14         MR. SALSBURY:  That's correct, Your Honor.

15         THE COURT:  That's all I wanted to straighten for

16    the record.

17         MR. WOODWARD:  So, Your Honor, again, I'm not

18    obviously wanting to waste the Court's time or have evidence

19    if the Court has the statement of facts.  That's my

20    argument, whether the Court agrees or doesn't agree, but

21    that this has to be looked at in context.

22         Certainly, my client has to be looked at based upon

23    what he did, and Mr. Salsbury, again, is true that

24    Mr. Mearing pled guilty to some different frauds, but

25    Mr. Hutsenpiller is mentioned at Paragraph 6 in

1    Mr. Mearing's statement of facts as being a GS-15 in the

2    Navy.

3            So I don't think it's contextually accurate to say

4    that they're completely unrelated.  Clearly, in my client's

5    statement of facts, company G, and you see in his statement

6    of facts, PAM is Phillip A. Mearing or PAM is Mr. Mearing.

7    They just didn't put his name in there because he hadn't

8    pled at that point.

9            But, certainly, Your Honor, we agree we are not

10   backpedaling from the statement of facts.  It says what it

11   says, and I've seen the government's paper.  We are

12   certainly not saying that everything in there is not true

13   and correct because it is.  But it's just a question of in

14   what context the Court looks at all of this, and as I think

15   just a matter of fundamental fairness that, you know, why my

16   client would be made to get the highest enhancement when two

17   people got none.

18           THE COURT:  I think it depends, Mr. Woodward,

19   though, on what their involvement was at the time they were

20   in this matter, and it's not all *vis-à-vis* because different

21   people were involved at different times.  The individuals

22   you've indicated were involved, some with different

23   companies, some with different time periods.  What I'm

24   hearing you say is that you don't contest that the

25   enhancement would be appropriate if you look at it from the

1    standpoint of it being otherwise extensive criminal activity
2    that would mandate the enhancement.
3         What you're saying is that the activities of your
4    client in this otherwise extensive activity does not mandate
5    the enhancement.  So you're not contesting that the
6    enhancement would apply from the standpoint of it being an
7    otherwise extensive criminal activity during the period that
8    your client was involved?
9         MR. WOODWARD:  That's absolutely correct, Your
10   Honor.  I think that it would be under the definition
11   otherwise extensive, but not everyone that's involved in
12   something that's otherwise extensive gets the enhancement.
13   Otherwise extensive is something that's meant to give the
14   Court or the government another option if there is not more
15   than five people.
16        But as the Court's well aware, there can be
17   conspiracies with dozens of people, and not everybody that's
18   involved is a leader, manager, or organizer.  Just like
19   there could be a conspiracy with two or three people that
20   was an extensive conspiracy, but the Court still has to look
21   at the role of each individual as to whether or not, within
22   that extensive activity, they were leader, manager, or
23   organizer.  So I agree that that is my position.
24        It's not the nature of the activity, it's the
25   nature of my client's involvement that I'm arguing.

```
 1              THE COURT:  Now, in the statement of facts, as I
 2    understand it, this defendant directed firm T?
 3              MR. WOODWARD:  Which paragraph, Your Honor?
 4              THE COURT:  It is in the statement of facts, is a
 5    summary at Page 7.
 6              MR. WOODWARD:  Paragraph 8, I see it.
 7              THE COURT:  Paragraph 7 through 11, is what I'm
 8    going to generally refer to.
 9              MR. WOODWARD:  Yes, ma'am.
10              THE COURT:  The United States has pointed it out in
11    its position paper that your client, through this statement
12    of facts, directed firm T to accept Global as its main
13    subcontractor, directed firm T to pass 5.1 million of
14    unexpected government funds to Global, discussed using 2.4
15    million of those funds to employ him at Global, and
16    requested that Global provide him with various items of
17    value and services for his personal use.
18              So the role, as you say, there can be any number of
19    managers and leaders in an enterprise.
20              MR. WOODWARD:  I agree.
21              THE COURT:  It was what was his role and did that
22    role in what he did constitute him being a manager and a
23    leader.  So, consequently, what they're suggesting, and as I
24    understand the statement of facts admits, is that it was his
25    direction of firm T to accept Global as its main contractor
```

1    and then directing firm T to pass a larger amount of money

2    and then getting employment at Global.

3          In other words, it's his activities while he was

4    involved from 2010 to 2015.  I want to make that clear.

5    It's his involvement, not somebody else's involvement.  We

6    are not looking at it *vis-à-vis* somebody else's.  It's his

7    involvement, was he a manager or a leader?

8          So that is what I think is the argument.  I think

9    the Court is going to need to hear evidence, Mr. Salsbury,

10   because if he directed these people, what did he direct them

11   to do?  Otherwise extensive is a nebulous term, and what

12   Mr. Woodward is going to argue now, and perhaps later, is

13   simply that, yes, the whole enterprise, the whole activity

14   was otherwise extensive, and my client was only involved in

15   this segment of it, and this is inherently unfair that he is

16   getting this enhancement when other people haven't.

17         That is, in my mind, diverting the argument from

18   the point of this individual's involvement during this time

19   period and what he did in terms of directing firm T and what

20   he did at Global and *vis-à-vis* the people who were doing it.

21   I think the people that he is directing and having them be

22   in this activity is very important to the Court's

23   determination of what his role was.

24         MR. SALSBURY:  May I respond, Your Honor?

25         THE COURT:  Yes.

1          MR. WOODWARD:  Your Honor, just before
2    Mr. Salsbury, I do, of course, agree that that's what the
3    statement of facts says.  We have stipulated that those were
4    his activities, so we don't take any issue with that.  I
5    would want to point out, before I give up the podium, that
6    not everybody can be a leader, manager, or organizer.
7          THE COURT:  I didn't say everybody.  I said more
8    than one person.
9          MR. WOODWARD:  More than one.
10         THE COURT:  I did not say that everybody could be a
11   leader or a manager.  My words were more than one
12   individual.
13         MR. WOODWARD:  I wasn't suggesting the Court had
14   said that.  I just wanted to make that point.
15         THE COURT:  All right.
16         MR. SALSBURY:  Your Honor, just to clarify matters
17   from the government's point of view before I put on
18   evidence, being an organizer or leader gives you the four
19   points.  Manager or supervisor gives you the three points,
20   as I read 3B1.1.
21          So the government's position is that this defendant
22   was an organizer or a leader in the criminal activity to
23   which he has pled guilty and which is set forth in the
24   statement of facts.  For the reasons you mentioned, which
25   are contained in our position paper beginning at Page 3,

1    that using the word direct, we are obviously using it

2    somewhat as a euphemism for strong-arming, strong-arming the

3    prime contractor to agree to use a particular subcontractor

4    Global and then causing those unexpected government funds to

5    remain with Global so that this defendant could use them for

6    various purposes, including funding what at that time was

7    his anticipated retirement.

8            It was this defendant -- it's all in the statement

9    of facts -- who made several requests that Global provide

10   him with various items of value and services for his

11   personal use, which Global purchased with those unexpended

12   government funds, and that he directed all this, as set

13   forth in the statement of facts, and now we have a

14   concession by the defense that the activity was, indeed,

15   extensive.

16           I will tell the Court, Mr. Deines and Mr. Bricker

17   did not plead to the offenses that this defendant did or to

18   the relevant conduct regarding the unexpended government

19   funds.  They pled to other criminal activity.  Mr. Bricker

20   and Mr. Deines were not regarded by the government as an

21   organizer, leader, or manager or supervisor.  That's why

22   they didn't receive an enhancement under 3B1.1.  There is

23   nothing fundamentally unfair, as contended by Mr. Woodward.

24           The evidence we would put on, Your Honor, that I

25   have prepared for, regards whether there are five or more

1    participants, which is the alternative basis for the

2    application of the four level enhancement.  I could

3    potentially ask this witness, who's an agent, about

4    Mr. Hutsenpiller and the activities that he directed, but,

5    frankly, it's all set forth, as you've noted, in the

6    statement of facts.

7         It's just, to me, beyond doubt that, based on the

8    face of the statement of facts and everything that the

9    defendant has agreed that he directed, that he's an

10   organizer or leader.  So, again, my point is, with the

11   defense's concession that we have extensive criminal

12   activity, and with all the various things that the defense

13   agrees in the statement of facts that the defendant

14   directed, the four level enhancement applies because he's

15   most definitely an organizer or leader.

16        But if the Court does want, I'll present evidence

17   on the other basis for the application of the four level

18   enhancement, which is five or more participants.

19        THE COURT:  Well, if there are five or more

20   participants, and there is some indication of what they were

21   doing, *vis-à-vis* what this defendant was doing, that would

22   be important to the Court in deciding, because, first of

23   all, he objects.  I know manager is the three points, and

24   you wanted it under (a) as basically an organizer or leader.

25   He's been assessed three points.  You are arguing for four

1   points.  You are arguing him being enhanced as basically an

2   organizer or a leader under 3B1.1(a), and he's arguing the

3   enhancement is under (b) in the determination, and he's

4   arguing for no enhancement.

5           I also, though, have a question ultimately of the

6   acceptance of responsibility because if he's denying and

7   saying I was not, and this is fact-based, this is a

8   fact-based determination that a Court has to make,

9   fact-based determination on whether you have any

10  participants, otherwise extensive, what the role was, if the

11  Court is making factual determinations, and the individual

12  is saying no, then I'm not sure that acceptance of

13  responsibility is appropriate.  I may have missed it.  Did

14  you actually make your motion for the third point?

15          MR. SALSBURY:  I believe we did.

16          THE COURT:  I know they included it in there, but I

17  haven't granted that motion for the third point.  So I have

18  not granted a motion for a third point for acceptance of

19  responsibility.  If someone backs away, it is ultimately for

20  the Court to determine whether or not, A, the individual

21  gets the two points in terms of their guideline

22  calculations; and, B, whether the Court grants the motion

23  for the third point.

24          If someone is contesting what their role was, well,

25  then if the Court finds otherwise, is not fully and

1   completely accepting responsibility for their criminal

2   actions.  I'm going to make that clear up front, that you

3   can't have it all different ways.  You can't say give me all

4   my points for acceptance of responsibility, but, by the way,

5   I really wasn't a manager or a leader or whatever.

6            Then maybe the Court rules otherwise, and they keep

7   all their acceptance of responsibility points.  But I want

8   to make that clear before we start into evidence.  I do want

9   evidence.

10           MR. WOODWARD:  May I be heard real quick before the

11  evidence, Your Honor?

12           THE COURT:  Briefly.

13           MR. WOODWARD:  I just wanted the Court to be clear.

14  I'm trying to make a legal argument.

15           THE COURT:  It is not a legal argument.  It is

16  factually based.  The guidelines say that I have to

17  determine, based upon the facts before the Court, whether

18  someone was a manager, a leader, or a supervisor or an

19  organizer of a criminal activity.  In this case they are

20  saying involved five or more participants or was otherwise

21  extensive, and I'm going to have to make a factual

22  determination of that.

23           You are contesting that determination.  It is not a

24  legal determination.  It is a factual determination.

25           MR. WOODWARD:  May I respond, Your Honor?

1      THE COURT:  Yes.

2      MR. WOODWARD:  What my understanding, I decided to

3  make this objection, not Mr. Hutsenpiller.

4      THE COURT:  No.  I want to interject here for an

5  important reason.  You are his counsel.

6      MR. WOODWARD:  I understand.

7      THE COURT:  You make decisions in conjunction with

8  him.  So you are his counsel, and whatever you represent to

9  the Court is his decision, not just your decision.  You make

10  a decision.  We are not going to go down that road that its

11  your decision and not his decision, so then he's not held to

12  the arguments and the decisions of counsel.  Because he is

13  held to the arguments and the decisions of counsel.

14      MR. WOODWARD:  Yes, Your Honor.  I understand.

15  Maybe that was unartful.  My argument, the argument I'm

16  trying to make, is not that he didn't engage in any of the

17  conduct that is in the statement of facts or that the

18  government has said he engaged in.  There were more than

19  five people involved.  I don't think there is any question

20  about that.

21      I, perhaps, unartfully was trying to make the

22  argument that even if all that's factually true, it doesn't

23  qualify legally as being -- certainly the four point

24  enhancement and/or the three.  So, again, my argument is not

25  on the facts.  My argument is if the Court believes all

1   those facts, which they are stipulated to, they are in the

2   statement of facts, this is what he did, I think in all of

3   these enhancements, first the Court finds the facts which

4   are uncontested here, and then my belief is, and always has

5   been, lawyers make legal arguments about what the import of

6   those facts are *vis-à-vis* the guidelines.

7          That's what I'm attempting to do, not to contest

8   any facts.  I agree that it was extensive.  I agree that

9   Mr. Salsbury can submit evidence that there were more than

10  five people that were involved.  My only argument is, is if

11  you take what Mr. Hutsenpiller did, and Mr. Salsbury is

12  right, we stipulated that he directed this, he directed

13  that, he did what he did, that in the context of this case,

14  he shouldn't get the enhancement.  But I certainly, he's not

15  and I'm not trying in any way to not accept responsibility.

16  I think the Court, once you find the facts, has to make a

17  legal determination what the import of those facts are.

18          We are not contesting any facts.  I'm finished,

19  Your Honor.

20          THE COURT:  All right.  Well, the way the Court

21  looks at a statement of facts, the statement of facts is the

22  floor.  It is not a ceiling.  A statement of facts is a

23  document that is submitted to the Court and filed under

24  oath, and a defendant obviously cannot back away, or they

25  can, but if they do, then there are issues over the plea and

1    other matters.

2         The statement of facts is a floor.  It is not a

3    ceiling.  There is an enhancement here based on matters that

4    are outside of the statement of facts.  So I'm going to take

5    evidence.  If this objection is fair, I will find full

6    facts, and I have made the Court's position clear.

7         It's the Court's opinion, whether someone is a

8    manager or supervisor or leader and the role that they

9    played is based on facts, the facts of the case, the facts

10   that everyone knows.  The Court only has the statement of

11   facts and the PSR.  There is an objection, and if there is

12   going to be a persistence in that objection, based upon the

13   facts that everybody knows what they are at this point, the

14   defendant, and the attorneys, I'm going to take evidence and

15   I'm going to make that determination.  So go forward with

16   your evidence, Mr. Salsbury.

17        MR. SALSBURY:  The government calls Dan Lanter,

18   L-a-n-t-e-r.

19        MR. WOODWARD:  Your Honor, may I address the Court?

20   I just consulted with Mr. Hutsenpiller, and he's directed

21   me, I agree that he should withdraw his objection.  I can't

22   withdraw the government's objection, but we would withdraw

23   our objection to the presentence report.

24        THE COURT:  All right.  We need to place the

25   defendant under oath because I'm going to verify that that's

1    his decision.

2              MR. WOODWARD:  I understand, Your Honor.

3              THE COURT:  We need to place the defendant under

4    oath.

5              (Defendant was sworn.)

6              THE COURT:  Mr. Hutsenpiller, if you would please

7    come up to the podium with Mr. Woodward.

8              Mr. Hutsenpiller, you have heard the discussions

9    here in court today about your role in the offense, have you

10   not?

11             THE DEFENDANT:  Yes, ma'am.

12             THE COURT:  Also, you understand that there was an

13   objection filed by you or on your behalf that there be no

14   enhancement for any type of managerial role in the offense,

15   that you were given a three level enhancement in the

16   presentence report for your managerial role in the offense

17   and that you have filed an objection to that.  Do you

18   understand?

19             THE DEFENDANT:  Yes, ma'am.

20             THE COURT:  Your attorney has represented that

21   after discussion with you that you wish to withdraw that

22   objection; is that correct?

23             THE DEFENDANT:  Yes, ma'am.

24             THE COURT:  Do you have any questions about

25   withdrawing that objection?

```
1            THE DEFENDANT:  No, ma'am.
2            THE COURT:  Have you discussed it with
3    Mr. Woodward?
4            THE DEFENDANT:  Yes.
5            THE COURT:  Mr. Woodward, have you discussed it
6    with the defendant?
7            MR. WOODWARD:  I have, Your Honor.
8            THE COURT:  All right.  Do you have any questions?
9            THE DEFENDANT:  No.
10            THE COURT:  Do you have anything further you want
11    the Court to review with him?
12            MR. WOODWARD:  No, ma'am.
13            THE COURT:  Mr. Hutsenpiller, do you still withdraw
14    the objection?
15            THE DEFENDANT:  Yes, ma'am.
16            THE COURT:  All right.  Wait just a moment.
17    Mr. Salsbury wants a word before I make any ruling.
18            MR. SALSBURY:  Is the defendant agreeing with the
19    government's position that the four level enhancement
20    applies?
21            THE COURT:  No.  As I understand it, at this
22    juncture, what I heard was he is withdrawing his objection
23    to the three level enhancement in the PSR and in the
24    guideline calculation.  He is accepting the guidelines as
25    calculated, including the three level enhancement.  Is that
```

```
 1   correct, Mr. Woodward?
 2          MR. WOODWARD:  That's correct, Your Honor.
 3          THE COURT:  Is that correct under your
 4   understanding, Mr. Hutsenpiller?
 5          THE DEFENDANT:  Yes, ma'am.
 6          THE COURT:  Then I accept the withdrawal of the
 7   defendant's objection to the three level enhancement under
 8   the United States Sentencing Guideline Section 3B1.1(b).
 9   You can be seated.
10          All right, Mr. Salsbury.
11          MR. SALSBURY:  The government calls Dan Lanter.
12          (Witness was sworn.)
13          DAN LANTER, called by the Government, having been
14   first duly sworn, was examined and testified as follows:
15                      DIRECT EXAMINATION
16   BY MR. SALSBURY:
17   Q.  Please state your name and occupation.
18   A.  My name is Dan Lanter.  I'm a special agent with the
19   Defense Criminal Investigative Service.
20   Q.  Agent Lanter, have the activities of William Hutsenpiller
21   and others been the subject of a joint investigation by the
22   Defense Criminal Investigative Service, the Naval
23   Investigative Service, and the FBI?
24   A.  Yes, sir, it has.
25   Q.  Are you one of the investigating agents?
```

Lanter, D. - Direct                                                    27

1    A.  Yes, sir, I am.

2    Q.  This has been a long-term investigation; is that correct?

3    A.  Yes, sir, it has.

4    Q.  When did it begin?

5    A.  The investigation began in approximately April 2011.

6    2012 I came onto the case and have been on it ever since.

7    Q.  Are you familiar with the criminal information and

8    statement of facts filed in this case against

9    Mr. Hutsenpiller?

10   A.  Yes, sir, I am.

11   Q.  Now, according to that statement of facts, there are two

12   areas of criminal activity that Mr. Hutsenpiller and

13   co-conspirators engaged in.  One was a conspiracy to provide

14   illegal gratuities to Mr. Hutsenpiller; is that correct?

15   A.  Yes, sir.

16   Q.  And the other was to direct a government contractor to

17   use Global Services Corporation, which was owned by

18   co-conspirator Phillip Mearing, as a subcontractor for the

19   purpose of retaining millions of dollars of unexpended

20   government funds that should have been returned to the

21   government thereby permitting Mr. Hutsenpiller to have access

22   to Global and those funds; is that correct?

23   A.  Yes, sir, it is.

24   Q.  Phillip Mearing and Kenneth Deines, who was then the

25   corporate controller of Global, are named in the statement of

```
 1   facts as conspirators in the scheme to provide illegal
 2   gratuities to Mr. Hutsenpiller; is that correct?
 3   A.  Yes, sir, it is.
 4   Q.  And Mr. Mearing is also named in the statement of facts
 5   as a conspirator in the other scheme to have Global retain
 6   unexpended government funds that should have been returned to
 7   the government, correct?
 8   A.  Yes, sir.
 9   Q.  Did your investigation reveal the participation of other
10   conspirators in one or both of those schemes?
11   A.  Yes, sir, it did.
12   Q.  Specifically, did you investigate the activities of the
13   following individuals:  Joe Olszewski, Corey Creek, Steve
14   Parisi and Sigfredo Laluz?
15   A.  Yes, sir, I did.
16          THE COURT:  Can you repeat those names again,
17   please.
18          MR. SALSBURY:  I will.  Joe Olszewski.  Would you
19   spell the last name.
20          THE WITNESS:  O-l-s-z-e-w-s-k-i.
21   BY MR. SALSBURY:
22   Q.  All right.  Corey Creek; is that correct?
23   A.  Yes, sir.
24   Q.  Steve Parisi?
25   A.  Yes, sir.
```

Lanter, D. - Direct                                                    29

```
 1    Q.   How do you spell Parisa?
 2    A.   P-a-r-i-s-i.
 3    Q.   And Sigfredo Laluz?
 4    A.   Yes.
 5    Q.   And how do you spell both his names?
 6    A.   S-i-g-f-r-e-d-o, L-a-l-u-z.
 7    Q.   All right.  In the course of your investigation, did
 8    those individuals make statements to you or other agents?
 9    A.   Yes, sir, they did.
10    Q.   And did you also review documents as part of your
11    investigation?
12    A.   Yes, sir.
13    Q.   What sort of documents?
14    A.   Government contracts, bank records, e-mails, both from
15    personal e-mail accounts and government e-mail accounts,
16    business records from companies that were involved, invoices,
17    things of that nature.
18    Q.   I'm going to ask you to summarize what your investigation
19    revealed regarding the activities of each of these four
20    individuals in one or both of the illegal schemes that we
21    mentioned.  First, let me ask you about Joe Olszewski.  Did
22    he participate in the scheme to have Global retain unexpended
23    government funds that should have been returned to the
24    government?
25    A.   Yes, sir, he did.
```

Q.  All right.  Tell the Court what that was about.

A.   Okay.  On Joe Olszewski was a former government employee.
Upon his retirement he went to work for a contractor called
Blanchard and Associates.  As a contractor for Blanchard and
Associates, he worked directly for William Hutsenpiller.  In
2008 Joe Olszewski introduced Mr. Hutsenpiller to Ken Deines
and Phil Mearing.  At that time an agreement was reached
between the individuals that William Hutsenpiller would help
steer government contracts to Global Services Corporation,
and Global Services would hold unexpended funds in an account
at Global.

     Joe Olszewski described this as the cottage
industry, the scheme and the participants, and the way that
funds would be put into this reserve account would be through
false claims or through fees charged on contracts that
weren't -- the sponsors were not aware of.  This began in
2008.  The first deposit into the reserves, which went by
many names, the J-O-R, the JOR Reserves, that was made in
November of 2008.

     Global was at that time a subcontractor for VSE
Corporation, a company out of Alexandria, Virginia.  That
contract expired in 2010.  When that contract expired, the
Naval Ship Support Activity, where Mr. Hutsenpiller worked,
awarded another contract to a company called TransTecs, which
was based in Wichita, Kansas.  In an interview with Joe

Lanter, D. - Direct                                                31

1    Olszewski, he relayed that this development was very

2    disturbing to himself and Mr. Hutsenpiller because Global was

3    no longer on a contract where they could direct money to

4    Global to build the reserves.

5            Mr. Olszewski relaid that in mid-March of 2010, he

6    had a meeting with Mr. Hutsenpiller where they discussed this

7    issue and Mr. Hutsenpiller's desire to have Global added on

8    to the Transtecs contract as a subcontractor.

9    Q.  Is Transtecs the company referred to in the statement of

10   facts as Firm T?

11   A.  Yes, sir, it is.

12   Q.  All right.  They discussed various ways to force

13   Transtecs to accept Global as a subcontractor, and one of the

14   options mentioned by Mr. Hutsenpiller was that they could

15   cancel the contract and Transtecs wouldn't get any money.

16           On March 18th, 2010, there was a meeting on the Navy

17   yard of Navy contracting personnel that Mr. Hutsenpiller was

18   present at, along with the owner and the project manager of

19   Transtecs.  During that meeting, according to an interview

20   with the owner of Transtecs, he was asked did he intend to

21   subcontract on this contract, to which he replied negatively,

22   and the owner in his interview stated that Mr. Hutsenpiller

23   made a comment to the effect of, well, let's hold on to that

24   answer.

25           So following that meeting, the owner and the project

```
 1   manager were invited into Mr. Hutsenpiller's office.  Joe
 2   Olszewski was present at this meeting, and Joe Olszewski
 3   relayed that the conversation that he and Mr. Hutsenpiller
 4   had the previous day about coercing Transtecs to take on
 5   Global as a subcontractor, those details relayed to Transtecs
 6   that the contract could be canceled if they didn't agree to
 7   go along.
 8            Over the next month until May 3rd of 2010, there are
 9   various meetings held that Mr. Hutsenpiller was present for
10   or not present for, but other individuals within this
11   agreement, which resulted in Transtecs finally agreeing to
12   take on Global as a subcontractor.
13            THE COURT:  Excuse me.  Transtecs is Firm T?
14            THE WITNESS:  Yes, ma'am.  Transtecs is Firm T.
15            THE COURT:  Referred throughout the PSR.  So that's
16   what we've been referring to in the statements of facts and
17   the PSR as Firm T as Transtecs?
18            THE WITNESS:  Transtecs, yes, ma'am.  I apologize.
19            THE COURT:  That's just me clearing the record.
20            THE WITNESS:  Okay.  Once Global was accepted by
21   Transtecs, the cottage industry could continue and did
22   continue.  Global submitted false claims that resulted in
23   government money being put into the reserves that could be
24   used later by William Hutsenpiller, among other schemes that
25   put money into the reserves.
```

Lanter, D. - Direct                                                    33

```
 1   BY MR. SALSBURY:
 2   Q.  And it was Mr. Hutsenpiller at this initial meeting with
 3   Transtecs when Transtecs said they weren't going to use the
 4   subcontractor, he said, hold on to that answer?
 5   A.  That is what the owner of Transtecs reported to us in the
 6   interview, yes, sir.
 7           THE COURT:  Who is that owner?
 8           THE WITNESS:  His name is Dr. Godwin Opara.
 9   BY MR. SALSBURY:
10   Q.  And then based on what you've testified in accordance
11   with the statement of facts, Mr. Hutsenpiller was a primary
12   participant in forcing Transtecs to take on Global as a
13   subcontractor?
14   A.  Yes, sir.  Starting from the beginning when the contract
15   was awarded, Mr. Hutsenpiller immediately -- he found out on
16   March 5th of 2010 that the contract had been awarded to
17   Transtecs.  That day he contacted Phil Mearing to tell him
18   that Transtecs was going to win the contract.  They set up a
19   meeting where Mr. Mearing, his wife, and Mr. Hutsenpiller and
20   his wife would meet ten days later to discuss.
21           The meeting happened on the 18th at the Navy base,
22   and then on the 30th of March of 2010, Mr. Olszewski and
23   Mr. Hutsenpiller both traveled to Fayetteville, where Global
24   was headquartered, to discuss how the contract would be run
25   and how Global would participate in it, and in the interview
```

Lanter, D. - Direct                                                  34

1    Mr. Olszewski again brought up at that time Mr. Hutsenpiller

2    had talked about cancelling the contract.

3          Over the next month of April, there were various

4    meetings that were called by Mr. Hutsenpiller that involved

5    Navy personnel which were held on the Navy base.

6          THE COURT:  We are still in what year now?

7          THE WITNESS:  We are still in 2010, ma'am.

8          THE COURT:  All right.

9          THE WITNESS:  That were held with Naval personnel

10   and the contracting personnel on the Navy base early in the

11   morning, and then in the afternoon Mr. Hutsenpiller called

12   meetings with the subcontractors to be held at Global so

13   they could discuss the scheme away from the government

14   folks.

15         Mr. Hutsenpiller played a key role in getting

16   Global onto this contract.  During e-mail review -- well,

17   let me back up.  Global, Dr. Opara first met the Global

18   representatives on April 12th of 2010, according to his

19   interview.  E-mail review showed that on April 6th of that

20   same year, so six days prior to even meeting, Global

21   personnel were drawing up a subcontracting agreement to work

22   with Transtecs before it even met the company, and during

23   the search warrant we found notes with William's name

24   written at the top and all kinds of things to be put into

25   the subcontracting agreement.

Lanter, D. - Direct                                                35

1          So from the very beginning Mr. Hutsenpiller played

2    an instrumental role in working with Global to get onto the

3    Transtecs contract so they could continue the cottage

4    industry.

5          THE COURT:  William being William Hutsenpiller?

6          THE WITNESS:  Yes, ma'am.

7    BY MR. SALSBURY:

8    Q.  Still, on Mr. Olszewski, did he participate in the scheme

9    to provide Mr. Hutsenpiller with illegal gratuities, and as

10   you answer that question, also indicate how Mr. Hutsenpiller

11   himself participated in that scheme.

12   A.  Yes, sir.  According to the interview with Mr. Olszewski,

13   he stated that Mr. Hutsenpiller would find a particular item

14   that he wanted, an iPad, a new phone, Bose headphones,

15   learning thermostat, were just some of the items that we

16   found documents for.

17          So Mr. Hutsenpiller would make that request, and

18   then that information would go to Corey Creek or Steve

19   Parisi, who would conduct market research to figure out how

20   much that cost, the best place to get it.  That information

21   would be sent to Joe Olszewski who would then provide it to

22   Ken Deines at Global Services.  Ken would create a purchase

23   order to procure those items, and the funding for those items

24   was removed from this reserve account at Global, and then the

25   items that were procured were sent to Steve Parisi in

 1   Florida.

 2        Steve Parisi had a technical background, an IT

 3   background, so items like computers or iPhones, Mr. Parisi

 4   took time to set the items up, and then he would ship them to

 5   Virginia here to i-Mazing, which is a contractor in Virginia

 6   Beach where Corey Creek worked, or to the Global Service

 7   office in Chesapeake where either Corey Creek would pick the

 8   items up or they could be delivered to William by Global

 9   Chesapeake personnel.

10        THE COURT:  Let me go back just for a moment.  You

11   mentioned a meeting that was set up with Mr. Hutsenpiller

12   and his spouse.

13        THE WITNESS:  Yes, ma'am.

14        THE COURT:  If I understand it, Mr. Hutsenpiller

15   was a civilian GS-15 employee, the head comptroller of the

16   Norfolk Ship Support Activity at this time because he was

17   there from approximately, the statement of facts, from 2009

18   to 2013.

19        What was the reason his spouse was at a meeting

20   with an employee of the Base?  We are not talking about a

21   private company now with officers.  Was there any reason why

22   a spouse would be there?

23        THE WITNESS:  I don't know.  The e-mail was sent by

24   Phil Mearing, and it said something to the effect of, would

25   like to have dinner with you and your wife.  Let us know the

1   soonest.  We need to lock in our sitter.  And that e-mail

2   was sent at 2:30 on the 5th of March, and by 2:36

3   Mr. Hutsenpiller had replied that they'd attend.

4   BY MR. SALSBURY:

5   Q.  And it was Mr. Hutsenpiller who chose what items he

6   wanted to receive?

7   A.  Yes, sir.

8   Q.  And would he have known those items were going to be paid

9   for out of government funds?

10   A.  Yes, sir.

11   Q.  All right.  Now, moving to the next individual, Corey

12   Creek, with regard to the scheme to provide Mr. Hutsenpiller

13   with illegal gratuities, I think you've mentioned that

14   already --

15   A.  Yes, sir.

16   Q.  -- when you gave your answer regarding Mr. Olszewski; is

17   that correct?

18   A.  Yes, sir.

19   Q.  So Mr. Creek participated in that scheme?

20   A.  Yes, sir.  We followed e-mails of Mr. Creek conducting

21   the research to include e-mails of Mr. Creek procuring cell

22   phones for Mr. Hutsenpiller's personal cell phone number and

23   his cell phone for his wife.

24   Q.  And did Mr. Creek also participate in the scheme to have

25   Global retain unexpended government funds that should have

1   been returned to the government?

2   A.  Yes, sir.  Mr. Creek was a contractor for i-Mazing

3   Solutions, a company out of Virginia Beach.  According to

4   interview with Mr. Olszewski, Creek's job existed solely to

5   carry on this cottage industry.  Corey Creek, his e-mail

6   signature was labeled financial analyst to William

7   Hutsenpiller.  He's used a personal e-mail address to conduct

8   business because he's a convicted felon and is unable to

9   obtain a security clearance or a government e-mail.  So all

10  the work that he was doing was on this AOL account.

11          Mr. Creek assisted in multiple ways in getting money

12  into the reserves, a reserve account, to include charging

13  fees and providing proprietary government information to

14  company fitting.  An example would be in this case with the

15  Transtecs, the Seaport-E is an overarching contract, and when

16  a company is awarded the contract on that, they can have

17  multiple prime contractors, and in this case Transtecs was

18  one of those multiple prime contractors.

19          Now, the way the process works is that, yes, you are

20  awarded a contract, but you're not guaranteed work.  Work has

21  to be added onto the contract via technical direction letter

22  or a TDL, and the TDLs contain statement of work, location of

23  work, hours, the nuts and bolts of the work to be done.

24          So that has to be bid on.  Part of Corey Creek's job

25  was to create an independent government estimate.  The

1   independent government estimate is utilized by the government

2   to determine if a bid is fair and reasonable.  So, for

3   example, if Creek created an IGE for $100,000 worth of work,

4   that's what the government is determined it's going to be,

5   fair and reasonable, for a particular TDL.

6          However, say a company wants to bid $70,000, they

7   look at the TDL and say it's $70,000.  Well, by Corey

8   providing Ken Deines and Global the TDL or the IGE, they can

9   now bid $100,000, and, therefore, cost the government $30,000

10  more dollars which can be funneled into the reserves.

11  Another thing that Corey Creek was involved in was a 3 or 4

12  percent fee was tacked on by Mr. Hutsenpiller on contracts

13  that were bid.

14         Typically, the command or the sponsor didn't know

15  that this fee was being added onto the contract.  Now, there

16  is not a contract line item for fees, and most of the time,

17  through the e-mail review, we could see Corey Creek

18  conversing with Ken Deines and Global, adding the fee within

19  the travel line item on the contract or in the labor line

20  item.  So this fee would be hidden in the contract.

21         Once it's awarded, the money trickled down to

22  Global.  Global would remove that 3 or 4 percent, move that

23  to the reserves, and then that reserve account again has

24  money in it that can be used at William's direction.

25         THE COURT:  So when you say at William's direction,

Lanter, D. - Direct                                           40

```
 1   he was directing who?
 2           THE WITNESS:  William Hutsenpiller or Olszewski, or
 3   a lot of time William Hutsenpiller through Joe Olszewski,
 4   would say, you know, release funding, and they would send an
 5   e-mail, typically to Ken Deines at Global Services to
 6   release money out of reserves to make different purchases.
 7           THE COURT:  Who would they release it to, do you
 8   know?
 9           THE WITNESS:  It would depend.
10           THE COURT:  They were different?
11           THE WITNESS:  Yes.  It would depend, ma'am.
12           THE COURT:  Go ahead.
13   BY MR. SALSBURY:
14   Q.  So when you use the term reserves or reserve fund, you're
15   talking about the unexpended government funds that they
16   should not have had?
17   A.  Yes, sir.
18   Q.  All right.  And was it Mr. Hutsenpiller who added on this
19   non-legitimate 3 or 4 percent fee?
20   A.  Yes, sir.
21   Q.  That was his idea?
22   A.  Yes, sir.  It was done by Steve Parisi or Joe Olszewski,
23   but Parisi, Laluz, Olszewski, Deines all stated any direction
24   coming from Olszewski was taken as if it was coming from
25   Hutsenpiller.
```

Lanter, D. - Direct                                                    41

1  Q.  Let's go to the third individual, Steve Parisi.  I think,

2  again, you've touched on his participation in the illegal

3  gratuity scheme, but if you could briefly summarize it again.

4  A.  Yes, sir.  Steve Parisi was involved on the front end of

5  it in conducting the market research for the items that were

6  purchased.  He would determine what the cost would be, where

7  it should be purchased, send that information to Olszewski

8  who would forward it to Global where it was purchased, the

9  amount deducted from the reserves and then shipped to

10 Mr. Parisi.

11          Again, Mr. Parisi has an IT background.  He would

12 set up the iPhones, the computers, and things like that, and

13 then would ship the items from him, from his home to Virginia

14 where they were delivered to William by Global or Corey

15 Creek.

16 Q.  All right.  And did Mr. Parisi also participate in the

17 scheme to have Global retain the unexpended government funds?

18 A.  Yes, sir, he did.  Steve Parisi worked as a contractor,

19 first for VSE Corp. and then for Global Services.  According

20 to Mr. Parisi, his work was solely in support of

21 Mr. Hutsenpiller.  It wasn't conducting normal day-to-day

22 business for the other companies.  He worked as Joe

23 Olszewski's assistant.  He controlled all the spreadsheets

24 that the cottage industry was run off of.

25          When a contract was awarded, it would be added to

1    the spreadsheets.  Parisi would track when money was deducted

2    from different contracts.  He would also, when a contract

3    would expire, and there would be money left over, Parisi

4    would create the documents for the recoup, which is the term

5    that the cottage industry used for taking money that should

6    have been returned to the government and keeping it.

7             So you would treat documents that would cause that

8    extra money to be paid to Global and put into the reserves.

9    On a nearly weekly basis, he was comparing these spreadsheets

10   to documentation held by Ken Deines at Global to ensure that

11   it was accurate and that they had the accurate amount of

12   money for the way that the contracts were running.

13   Q.  All right.  Then the fourth individual I'd like you to

14   discuss is Sigfredo Laluz.  Did he participate, first in the

15   scheme to have Global retain the unexpended government funds?

16   A.  Yes, sir.  Fred Laluz was a formal government employee.

17   He worked in Pennsylvania.  At one point in 2010,

18   approximately, he was approached by Joe Olszewski and asked

19   if he wanted to work for Global with the caveat that he would

20   have to bring the work that he has -- that the government

21   over to Global.  He accepted.  He did participate in helping

22   get money into the reserves, and I'll give you an example of

23   that.

24             On April 20th of 2012, an e-mail conversation

25   occurred between Ken Deines and Phil Mearing in which Deines

1   was relaying a conversation that he had had with Joe

2   Olszewski.  Deines stated Olszewski wanted Global to create a

3   bid for new work for as close to 3 million as he possibly

4   could, and that William Hutsenpiller has zero tolerance for

5   this not to happen.

6           Mr. Mearing asked about a statement of work, and

7   Mr. Deines replied that Mr. Olszewski said that there were 78

8   documents on his desk already that had been completed by

9   Laluz and his gang that could be used as deliverables on the

10  contract.  Approximately five days later, there was an e-mail

11  between Phil Mearing and Fred Laluz in which Mearing asked

12  for copies of these documents.  Laluz provided to and said

13  these are more like statements of work than actual

14  assessments, which is what the contract was calling for.

15          Later that day Mr. Mearing e-mailed with Ken Deines,

16  and he agreed that there were more statements of work than

17  assessments, and that they would need to be repurposed so

18  they could be used.

19  Q.  Well, what's the difference, so the Court understands,

20  between an assessment and a statement of work?

21  A.  The assessment -- the statement of work was for -- Fred

22  Laluz's job was to go to a command building, like a classroom

23  and say, all this stuff needs to be done, like we need new

24  lights, we need a desk, we need new air conditioning,

25  whatever, and that would come up in the statement of work.

1           Then if I'm understanding correctly, once the

2   statement of work was accepted, its assessment was completed

3   to say that, yes, this was done, that was done.  And what

4   happened in this particular case was that documents that were

5   used on a 2011 contract for VSE for, let's just say classroom

6   A --

7   Q.  Is VSE a different contractor?

8   A.  Yes, sir.  VSE is a contractor based out of Alexandria, I

9   believe.  What happened was on that contract classroom A was

10  to have a new light, a new desk, a new this, a new that.

11  Well, that work was completed.  Now, when it came to 2012,

12  the same exact document for that classroom that had already

13  been completed is being submitted by Fred Laluz.  The date is

14  being changed.  So a false document is being submitted again

15  to Global to be submitted to the government in order to get

16  money into the reserves.

17  Q.  Was Mr. Hutsenpiller aware of these false documents?

18  A.  Mr. Hutsenpiller was the one who requested for this bid

19  to come through for as close to 3 million as possible, and

20  the eventual bid that was submitted, I believe it was April

21  27th of 2012 by Global, was for 2.97 million, and Ken Deines

22  stated that that was as close as possible that he could get

23  to the 3 million number requested by Hutsenpiller.

24  Q.  And it was Laluz who changed the dates?

25  A.  Yes, sir.  He changed the dates on the various

1   assessments and then were submitted, and eventually that

2   money was put into the reserves.

3   Q.  Did Mr. Laluz participate in the scheme to provide

4   Mr. Hutsenpiller with illegal gratuities?

5   A.  Not in the same way that the other individuals that were

6   mentioned.  He didn't have a role with electronics.  He did

7   provide Mr. Hutsenpiller with some gift certificates, bottle

8   of wine, dinner, small things like that.

9   Q.  In that instance regarding Mr. Laluz, was that out of

10  Mr. Laluz's own pocket?

11  A.  Yes.  That's what he said.

12  Q.  The other gratuities were paid out of government funds,

13  correct?

14  A.  Yes, sir.

15  Q.  Did one or more of these four persons receive immunity

16  from the government in exchange for their cooperation?

17  A.  Yes, sir.  Mr. Laluz and Mr. Olszewski both received

18  immunity.

19          MR. SALSBURY:  All right.  Thank you, Agent Lanter.

20          THE COURT:  So we have Mr. Olszewski, Mr. Creek,

21  Mr. Parisi, Mr. Laluz, Mr. Deines, Mr. Mearing, and

22  Mr. Hutsenpiller, all involved in all of this?

23          THE WITNESS:  Yes, ma'am.

24          MR. SALSBURY:  Thank you.  Answer any questions

25  Mr. Woodward may have.

```
 1            MR. WOODWARD:  I don't have any questions, Your
 2   Honor.
 3            THE COURT:  All right.  Then you may step down.
 4            THE WITNESS:  Thank you, ma'am.
 5            (Witness excused.)
 6            MR. SALSBURY:  Court want additional argument?
 7            THE COURT:  I want to ask do you have any further
 8   evidence?
 9            MR. SALSBURY:  No, Your Honor.
10            THE COURT:  Counsel, this is the way that the Court
11   deems it appropriate to proceed at this juncture.  This is
12   quite a bit of additional factual information that the Court
13   has heard through Mr. Lanter.  Consequently, what I'm going
14   to direct you to do is to file supplemental position papers
15   with suggested findings of fact and conclusions based on
16   those facts as to the applicable guideline.
17            The issue here is whether or not this individual
18   qualifies factually under the guidelines on those findings
19   of fact to be an organizer or a leader.  It's obviously an
20   important finding here because other matters could transpire
21   from the findings.  So it's a lot of information.  It is a
22   finding that could be dispositive of other matters, but it's
23   important that it be made, and it be made based upon all of
24   the information before the Court, in other words, the
25   presentence report, the statement of facts, and this
```

 1   testimony.  Obviously, if you need to, you can have the

 2   testimony transcribed.  That's up to you.

 3          I've taken very copious notes during the

 4   proceeding, as I'm sure you have.  So we will do that.  We

 5   will reconvene on the sentencing because I have to make this

 6   finding first from which flows the other guideline findings,

 7   or the guideline calculation, from which then flows a

 8   sentence, from which then flows a potential reduction.

 9          I have not yet granted the 5K1.1 motion.  You've

10   got a lot of different components here.  You've got first

11   the proper determination of the guidelines and this

12   defendant's role, his acceptance of responsibility.  I

13   haven't ruled on that motion yet, the actual sentence that

14   would be imposed under the guidelines, and then I will

15   proceed to argument on the 5K1.1, and if I grant that

16   motion, any reduction thereon.

17          MR. SALSBURY:  Your Honor, before we adjourn may I

18   confer briefly with Mr. Woodward?

19          THE COURT:  Yes.

20          MR. SALSBURY:  Thank you, Your Honor.

21          THE COURT:  All right.

22          MR. WOODWARD:  What is the timeline to submit our

23   authorities, Your Honor?

24          THE COURT:  I'm going to look at that.  How long do

25   you think you need?

 1          MR. SALSBURY:  I do intend to order the transcript.
 2     I don't know how quickly that can be provided.  I can order
 3     it on an expedited basis.
 4          THE COURT:  That's fine.  You can order it that
 5     way, but I don't want to push a court reporter on something
 6     unless it's time sensitive.  I understand.  So we are
 7     planning on ordering a transcript.  They should be
 8     simultaneous.  There is nothing for one person to respond to
 9     the other.  It's what you propose and the conclusion.  It's
10     not a response, he said/she said type of thing.  It's
11     simply, this is an amended position paper.
12          MR. WOODWARD:  Amended position paper.
13          THE COURT:  Yes.  I think it is a supplemental
14     position paper initially.  So you can either call it a
15     supplemental.  You're not amending anything you've done,
16     you're adding to it, so let's call it a supplemental
17     position paper with proposed findings of facts and
18     conclusion thereon, and let's set the continuance of the
19     sentencing date, then we can work backwards.
20          MR. WOODWARD:  Your Honor, in that regard, I don't
21     have my phone in here with my calendar on it.  If the Court
22     proposes a date, is it okay if I call my office to clear it?
23     I don't know what you're looking at, but I don't have it
24     memorized.  I know some of my trials.
25          THE COURT:  Let me suggest some, and then we will

1    go from there.

2              MR. WOODWARD:  Okay.

3              THE COURT:  The Court has either Thursday, October

4    12th; or Friday, October 13th at 2:00.

5              MR. SALSBURY:  I believe I have a sentencing before

6    you on October 13th, although I don't remember the time.

7              THE COURT:  You do, but it's in the morning.

8              MR. SALSBURY:  Okay.

9              THE COURT:  That's why I did the afternoon.  You

10   have a disposition in United States v. Mr. Withers, and

11   that's at 11:00 that morning.  That's why I said 2:00.

12             MR. SALSBURY:  Then I'm free.

13             MR. WOODWARD:  May I use the phone, Your Honor, to

14   see whether I have those dates?

15             THE COURT:  Yes.

16             MR. WOODWARD:  I'm clear either day.  I don't know

17   which one you were doing.

18             THE COURT:  Either one are fine with the Court.

19             MR. WOODWARD:  13th, Your Honor.

20             THE COURT:  Perhaps Mr. Salsbury can make one trip

21   over to the courthouse that day.  So we will set it for

22   2:00, Friday, October 13th.  I'm going to work backwards now

23   consistent with deadlines.  So let's look at some deadlines

24   here.  You all can have two weeks.  That should be more than

25   sufficient time, until Thursday, October 5th.  So that way

 1   there will be time for you to get a transcript, and,

 2   actually, you can have until close of business Friday,

 3   October 6.  Close of business means 5:00 to the Court, not

 4   electronic close of business midnight.

 5          So 5:00 October 6 you can make those filings, and

 6   then that gives a week before the scheduled sentencing.

 7          Counsel, is there anything that the Court needs to

 8   take up further today in this case?

 9          MR. SALSBURY:  No, Your Honor.

10          MR. WOODWARD:  No, ma'am.

11          THE COURT:  All right.  Then we are in recess on

12   this case.  Thank you.

13                       CERTIFICATION

14

15      I certify that the foregoing is a correct transcript

16   from the record of proceedings in the above-entitled matter.

17

18

19          X_____/s/_____x

20                     Jody A. Stewart

21               X_____9-27-2017 _____x

22                        Date

23

24

25